UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Labor Finders of South Carolina, Inc., | ) | Civil Action No. 3:14-468-CMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -versus- | ) | **OPINION and ORDER** |
| | ) | |
| Adams-Robinson Enterprises, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

  This matter is before the court on Defendant's motion for summary judgment. ECF No. 26. Plaintiff responded in opposition to Defendant's motion, ECF No. 30, and Defendant filed a reply to Plaintiff's response. ECF No. 32. After receiving permission to do so, Plaintiff filed a surreply in response to Defendant's reply. ECF No. 36. For the reasons noted below, Defendant's motion is denied. This matter is set for trial during the court's term beginning November 12, 2015.

  **I. BACKGROUND**

  In the light most favorable to Plaintiff, the facts are as follows. Defendant Adams-Robinson Enterprises, Inc. ("Adams-Robinson") was hired to construct a wastewater treatment plant in Columbia, South Carolina. In April 2010, Fred Harris ("Harris"), Vice President and General Superintendent of Adams-Robinson, stopped at Labor Finders of South Carolina, Inc.'s ("Labor Finders") Rosewood Drive office in Columbia, South Carolina, to discuss the possibility of using workers provided by Labor Finders to work at the Columbia wastewater treatment construction site (hereinafter the "job site"). Harris met with Labor Finders' Branch Manager John Gill ("Gill") and told Gill the categories of laborers Adams-Robinson would need. At that meeting, Gill told Harris

that Labor Finders provided workers' compensation insurance coverage to all of its laborers. Harris and Gill did not discuss, nor did Gill provide, a copy of Labor Finders' standard work order.

On May 4, 2010, Gill sent Harris an e-mail in which he set out Labor Finders' pay rate and bill rate for the different types of laborers requested by Harris.[1] Labor Finders first sent laborers to the job site on July 13, 2010. As was Labor Finders' routine, each Labor Finders' worker took a work order with him or her to the job site, kept the work order and presented it to Adams-Robinson at the end of the work day or week. After verifying the hours worked, an Adams-Robinson employee signed the work order and returned it to the worker. Labor Finders then used that work order to pay its worker at the end of each work day or week. Labor Finders submitted invoices and copies of the work orders to Adams-Robinson for payment. Adams-Robinson reviewed the work orders both at the job site office trailer and at its headquarters in Dayton, Ohio. After the invoices and work orders were reviewed and approved in both places, Adams-Robinson issued payment to Labor Finders for services rendered by Labor Finders employees.

On July 14, 2010, Labor Finders personnel faxed Adams-Robinson a New Customer Credit Application ("Credit Application") to Adams-Robinson's Dayton, Ohio corporate office. This Credit Application noted that Labor Finders' workers had been sent to the work site on July 13, 2010. The Credit Application states: "Terms and conditions of temporary usage are detailed on the back of each Labor Finders work order. The customer [Adams-Robinson] is responsible for the supervision of Labor Finders employees while on the customer work site."

On July 15, 2010, Anita Dudding, on behalf of Adams-Robinson, signed the Credit

---

[1] The pay rate is the hourly rate paid to the laborer by Labor Finders. The bill rate is what Labor Finders charges per laborer per hour worked. A percentage of the bill rate is used to pay for workers' compensation insurance.

2

Application. Ms. Dudding was authorized to review, modify, and sign the Credit Application on behalf of Adams-Robinson. Ms. Dudding crossed out some of the provisions in the Credit Application but not the two above-quoted sentences. Adams-Robinson knew about the terms contained in the Credit Application on July 15, 2010, including that there were terms and conditions detailed on the back of every work order.

The work order states on the first page: "CUSTOMER AGREES TO THE TERMS AND CONDITIONS SET FORTH ON THE REVERSE SIDE HEREOF . . . ." Among the terms and conditions on the reverse side of the work order is an indemnification clause:

> 4. It is expressly agreed and understood that Customer will hold harmless, defend, and indemnify Labor Finders for any and all claims, losses, or causes of action resulting from Customer's failure to properly supervise, train, or provide necessary safety standards compliance while Labor Finders employees are under the Customer's control. Further, Labor Finders reserves the right to subrogate any and all costs incurred by Labor Finders or their insurance company for claims that arise from Customer's failure to supervise or comply with safety standards, for injuries or death by Labor Finders employees as a result of Customer's acts or omissions.

During the 30(b)(6) deposition of Michael Bradley Adams, Vice President and General Manager of Adams-Robinson, Defendant acknowledged this language was on the back of all work orders submitted to it. Depo. of Michael Bradley Adams (30(b)(6)) at 114, 118-19, ECF No. 30-4. As noted above, Adams-Robinson employees verified the number of hours worked and signed the work orders. Adams-Robinson never refused to pay an invoice based upon a work order, and with the exception of one invoice, paid every invoice submitted to it for Labor Finders' workers in full.[2]

Johnny Woodle ("Woodle") was a worker provided by Labor Finders to Adams-Robinson

---

[2] The only missing work order was Woodle's work order for the week he was injured. However, Adams-Robinson verified that Woodle worked that week, and does not dispute that he was working at the site under the direction of Adams-Robinson's employees at the time of the accident.

3

at the job site beginning October 27, 2010. Woodle worked on a pipe laying crew supervised by Rob Blankenship, an Adams-Robinson employee who worked under and reported to Doug Harris. Woodle received weekly training from Adams-Robinson at safety talks regularly held on Mondays. On January 20, 2011, Woodle, along with Adams-Robinson employee Durwin Dylan Blankenship, entered a trench that was in the process of being sloped and made safe for entry.[3] Shortly after Woodle and Blankenship entered the trench, dirt caved in from the sidewalls, completely covering Woodle and partially covering Blankenship. Woodle and Blankenship were taken to the hospital for treatment. Woodle filed a workers' compensation claim against Labor Finders.

Adams-Robinson agrees the trench was not safe at the time of the accident that injured Woodle. Depo. of Michael Brantley Adams (30(b)(6)) at 124-25, 198, ECF No. 30-4. Doug Harris, who was the project superintendent for entire worksite, testified at his deposition that no one should have been in the trench or the pipe leading into the trench. Depo. of D. Harris at 106, 170-71, ECF No. 30-2.

During the entire course of the business relationship, no one from Adams-Robinson ever told Labor Finders that it (Adams-Robinson) would not be bound by the terms and conditions on the back of the work orders. Furthermore, following the incident, an OSHA investigator drew the attention of Michael Bradley Adams and Fred Harris to the terms and conditions on the work orders, yet Adams-Robinson continued to use Labor Finders workers and continued to sign work orders and and pay invoices from Labor Finders after the January 2011 incident.

---

[3] Woodle testified that his supervisor, Rob Blankenship, directed him to enter the trench; Blankenship testified that he directed Woodle to enter the pipe in the trench.

## II. STANDARD

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Rule 56(c)(1) provides as follows:

(1)  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

   (A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers or other materials; or

   (b)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

## III. DISCUSSION

Adams-Robinson argues that it is not bound by the indemnification language on the back of the work orders because the parties had an oral contract which did not include the work orders' indemnification language. Labor Finders contends that the parole evidence rule is applicable to the

5

parties' relationship as any oral agreement was modified by the Credit Application and work orders. Adams-Robinson replies that because there was no written contract, the parole evidence rule does not apply. Adams-Robinson further contends the Credit Application and work orders do not modify the parties' oral agreement because these documents do not contain any reference to the scope of work to be done or compensation to be paid.

Summary judgment must be denied as there exists a disputed issue of material fact regarding whether the Credit Application and work orders were a part of the parties' agreement. *See Keith v. River Consulting Inc.*, 618 S.E.2d 302 (S.C. Ct. App. 2005) (circuit court erred in granting summary judgment when genuine issue of material fact existed regarding whether indemnification agreement on back of job ticket was part of contract between the parties). Defendant cites *Work Connection, Inc. v. Universal Forest Prods., Inc.*, No. C3-01-1643, 2002 WL 1275700 ( Minn. Ct. App. 2002) (unpublished), to support its position that the indemnification language on the back of the work orders was not part of the parties' bargain. However, in *Work Connection*, there was no dispute that the defendant was "unaware of the indemnification clause on the back of the form." *Work Connection*, 2002 WL 1275700 at *3. That is not the case here. Both the Credit Application and the work orders, which Adams-Robinson employees had access to and were reviewing and signing at least weekly, contained language specifically referencing the work orders and the terms on the reverse of the work orders, which contained the indemnification language at issue.

Adams-Robinson also argues that because it bargained for and paid for workers compensation insurance as part of the "bill rate" it remitted to Labor Finders, the indemnity clause included on the back of the work orders should not provide a "windfall" to Labor Finders. Mem. Supp. Summ. J. at 11, ECF No. 26. No windfall occurs when a negligent party is required to

6

indemnify another's insurer for its own negligence.

Adams-Robinson also contends that as Woodle's statutory employer, it should benefit from the protections afforded under the Worker's Compensation Act. *See* S.C. Code Ann. § 41-1-400. However, as noted by Labor Finders, "a workers' compensation statute does not insulate an employer from liability under an express indemnification agreement." *BET Plant Svcs., Inc. v. W.D. Robinson Elec. Co., Inc.*, 941 F. Supp. 54, 56 (D.S.C. 1996). The statutory employer provision does not insulate Adams-Robinson from a breach of contract action by Labor Finders when Adams-Robinson's negligence or failure to supervise caused the accident. Therefore, a factfinder must also determine whether the accident was caused by Adams-Robinson's negligence or failure to supervise.

### IV. CONCLUSION

For the reasons noted above, Defendant's motion for summary judgment (ECF No. 26) is **denied**. This matter shall proceed to trial during the court's term of court beginning November 12, 2015. The Clerk shall issue a roster notice.

**IT IS SO ORDERED.**

                                          s/ Cameron McGowan Currie
                                          CAMERON MCGOWAN CURRIE
                                          SENIOR UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
September 30, 2015